of Registration and Elections. Mr. Sells, good morning. Good morning, Chief Judge Pryor. Thank you, and may it please the court. I'm Brian Sells, and I represent appellants Limari Ruiz-Torres,     has been found guilty of misdemeanor misdemeanor assault. This is about the language minority provisions of the Voting Rights Act, specifically sections 203 and 4E. Congress enacted these provisions to protect citizens who are of limited English proficiency, or LEP for short, just like Ms. Ruiz-Torres and Mr. Mendez. And yet the district court dismissed their claims, concluding among other things that they lack standing and failed to state a claim. It seemed to me the association had standing, that the district court misunderstood Jacobson, which followed a bench trial. And what's required in terms of proof of the diversion of resources versus the pleading standard, which is a more general pleading, is permissible. That's at least my perspective about standing, but I think you've got much bigger problems when it comes to the merits. Well, let me just say about two sentences about standing, Your Honor, because we agree with you, of course, on your interpretation of Jacobson. But we think that the court should make clear that standing for individual plaintiffs under the language minority provisions of the Voting Rights Act work just like it does under other provisions of the Voting Rights Act. And in this case, at least at the motion to dismiss stage, Ms. Ruiz-Torres and Mr. Mendez have standing because they are LEP citizens who allege difficulty understanding voting materials provided to them by the defendants. For purposes of Section 203, they allege that they live in Gwinnett County, and for purposes of Section 4E, they allege that they have been educated in non-English classrooms in Puerto Rico. And that's the categorical approach that this court took recently in the Greater Birmingham Ministries case, which was a challenge under Section 2, and the same categorical approach should apply here. But I'll turn now to the merits. The meat of this case is the district court's ruling that the plaintiffs have failed to state a claim for relief under Sections 203 and 4E. It seems to me 203 applies to covered jurisdictions, and so it doesn't prohibit non-covered states from providing English-only voting materials, and it doesn't require a covered jurisdiction like the county here to just try to translate voting materials that have been provided by a non-covered jurisdiction. That's the fundamental problem I have with the merits of your 203 claim. Well, let me get right to that, because we think there are at least three reasons why that's not the best reading of Section 203. The first, of course, is textual, that the dictionary definition of subject to means affected by, and the state of Georgia is clearly affected by Section 203. But doesn't 203 say, provide that, quote, no covered state or political subdivision shall provide voting materials only in the English language? How is Georgia a covered state? You've got to get past that hurdle for me. Okay. That goes straight to our contextual argument, Your Honor. The language you quoted from is from subsection B1 of Section 203. I think for context, we need to focus on subsection B2, which is the coverage formula. It is apparent from the coverage formula that there are political subdivisions within a fully covered state that are not exempt under the exception that appears in subsection B2B, right? So these are non-covered political subdivisions, and I'll give you an example of one, Terrell County, Texas. It sits on the Mexico border. It doesn't meet the criteria for the latest determinations under subsection B2A, but it is within the state of Texas, which is covered as a whole for the Spanish language. Texas and Florida are covered states. I understand that. But you have to get me past how Georgia is a covered state because I don't see how Georgia is a covered state. I understand that Gwinnett County is a covered political subdivision, and they must provide voting materials in the language of the minority group. Right. Terrell County is not a covered political subdivision, just like Collier County in Florida is not a covered political subdivision. Again, but in that case, the state of Florida is a covered state, and the Secretary of State in Florida provides materials. It does, but Collier County does not. Because why? It falls within the exception in B2B. Terrell County, Texas does not fall within the exception in B2B. So even though it is not a covered political subdivision, the county has to provide bilingual materials because it is subject to Section 203. If you don't read the text that way, then Terrell County gets to take advantage of the exception without actually falling within it. That's the only way to give effect to the structure of Section 203. And if Terrell County is subject to the prohibitions in Subsection B, then so is Georgia. You say that the opposite situation, where you have a covered state and a non-covered political subdivision, that the text clearly requires that result. Is that your argument? Yes, our argument is that the text is unambiguous. But if the situation we have here, which is the opposite situation, you don't have clear text that says that. I think it's subject to means affected by, Your Honor, but I think the context is equally clear. Because it's equally clear that there are non-covered states and covered political subdivisions. This is how you make this absurdity argument that doesn't seem to me to be really an absurdity argument. You think that, well, you ought to have the same policy applied to both. But that's not what Congress has to do. It doesn't have to apply the same. Well, sure. But Congress created an exception for political subdivisions, right? And if you look at the exception, it makes sense. Congress wanted to accept places like Collier County in Florida that don't have very many LEP citizens. Again, I'm having great difficulty with your argument. Because subject to means you have to be covered. You have to fall within the definition. So you need to look at what is the definition of covered? Are you a covered state or a covered political subdivision? Then subsection C applies because you are subject to the prohibition of subsection B. But again, Collier County doesn't have to provide materials in a language other than English. If the Secretary of State for the state of Florida chooses to do so because they are a covered state. So it's a very different animal that we're having a conversation about. The reason why Collier County doesn't have to provide the materials is because it falls within the exception. Not because it is not a covered jurisdiction. That's Terrell County, Texas for you. Terrell County, Texas does not fall within the exception. It is not a covered jurisdiction, but it must provide election materials. Why do you think Congress went through all of this and made all of these exceptions and different definitions for covered and uncovered if they wanted everybody to be covered? Well, they don't want everyone to be covered, Your Honor. Well, I did not create an exception for states. They create an exception for small counties that don't have very many LAP voters. They chose not to create an exception to the prohibitions for states because states are large enough that they can provide these materials. I think Judge Schlesinger's point is, though, your reading would bootstrap political subdivision coverage to apply to non-covered states in a way that Congress did not make explicit in the act. I don't think that's fair characterization of our position, Your Honor. Our position is that the state of Georgia is only subject to the prohibition in subsection B to the extent of Gwinnett County. It need not provide under this provision bilingual materials in any other county but Gwinnett County. So we're not bootstrapping to cover to make Georgia a covered jurisdiction. We are trying to protect the LAP voters in Gwinnett County which do fall under the coverage. Isn't that issue moot? Because didn't the Secretary of State already say they're not going to be sending any more ballots? That was a one-time thing as a result of the pandemic. We challenged five practices. You just listed one. The others remain. Do you agree that that one is moot now? We can see that in our reply brief, Your Honor. Yes, absolutely. Yes. I see that I'm over my time, but you've had questions. I want to make sure that I answer them all before I ask them. Do my colleagues have any more questions? Mr. Sells, I'll give you one minute to say something about the other section if you'd like. Sure. Section 4E. My main point about Section 4E is that the district court said that we only state a claim if we allege English-only elections. That English-only requirement appears nowhere in the text of Section 4E. It is inconsistent with the idea of the right to vote, and it's inconsistent with cases interpreting Section 4E, which have allowed for relief in situations where there was actually some bilingual assistance provided, but courts found that it was not enough. Okay. Yeah. Okay. You'll save your time for rebuttal. Let's hear from Mr. Tyson. Thank you. Good morning, Your Honors. Thank you. Good to see you again. I'm here today on behalf of the members of the Gwinnett Board of Registration and Elections, and I wanted to be very clear at the outset that Gwinnett County takes great pride in its efforts to ensure language access for its diverse population. The record in this case reflects the efforts Gwinnett made when it first became covered by Section 203 to try to go as much as they could beyond the requirements to ensure language access. But in this case, we believe… The district court misunderstood standing, didn't it? The requirement of what you have to show at the pleading stage versus what you show at trial. Jacobson was a post-trial opinion. Your Honor, I don't think the district court misunderstood that. Uh-oh. We've got to freeze. Sorry, Your Honor. Can you hear me now? We're having a bit of a feed problem. Go ahead, Mr. Tyson. I think he's frozen. He's frozen. Maybe Ms. Young could go in the meantime. Well, yeah, maybe Mr. Tyson can… Mr. Tyson, it looks like you're back. Yes, I can hear you now, Your Honors, if you can hear me. Yeah. Okay. Your Honor, I think that the key point is not that the district court didn't recognize that the standard is obviously much lower for the plaintiffs at the pleading stage. But I think what they pled is what's insufficient here. They plead that they are engaged in voter registration and voter turnout efforts for limited English-proficient voters. And then the allegation is the complaint is they're going to continue that activity, maybe just a little bit more of it, because of the English-only absentee ballot applications that went out. They also allege that they were going to have to divert resources that they would otherwise apply to other things because of this law. Yes, Your Honor, they make that argument. But again, I guess, and to your point from Jacobson, our view was if you're not alleging to what activities and from what activities you'll be diverting resources in the complaint, you haven't really shown an injury. You made kind of a bare allegation of diversion without supporting that. I think that's very different than the other cases from the 11th Circuit in Browning, in Billups, where there were clear activities, the NAACP was engaged in voter registration activities that it was stopping doing so that it could assist with photo IDs, for example. If you're simply doing the baseline work or already engaging in your own projects and are still able to do that, and that's the only allegation, we don't believe that's sufficient, even at the pleading stage, to show that you have an organizational harm. Ultimately, if that was enough, every organization devoted to voting could simply make a conclusory we're diverting resources allegation in their complaint and always challenge basically any voting law. And so we believe here the plaintiff should have- It's one thing to allege it at the pleading stage. It's another thing to actually have to prove how you diverted resources. And we have no displeading. It seems to me the law is pretty settled that the no displeading doesn't require much. And I understand that, Your Honor. So from our perspective, again, we think you look at mission and that you look at activities and go from there. I do want to touch briefly on a couple other points for the individual plaintiffs. They did not allege that Wynette was going to send them English only materials. Their main quibbles are with the secretary's office and with what he provides. So for in terms of an injury from Wynette as to the individual plaintiffs, we don't see that is there. On the traceability, redressability piece, the plaintiffs obviously quibble with the district courts look at the merits in terms of the illegal acts of the defendants here. And I think that's part of the analysis at this point. This court in Georgia Republican Party looked at the statutory authority of the secretary of state for absentee ballots in considering whether there was traceability and redressability as to the secretary. So the district court had something similar here looking at- Can we get to the merits? Can we talk about the website? Certainly we can. So for the Wynette website, I think it's important to distinguish kind of two pieces of the website. The first is there are hard coded translations that don't require an individual to search for any sort of additional functionality. On the Department of the Division of Elections website itself and Director Ledford's direct declaration in the record explains this and has the website pictures. There's English and Spanish together on the header. When you go into the election forms, there are bilingual forms there throughout. The issue plaintiffs raise with the translation is the auto translate feature of the website, which applies to the entirety of the county government that allows for a selection and a translation of those pages. So as far as the office is concerned, the elections division is providing those translations without someone having to take additional action. And we would also submit that that website is not election materials. It's not ballots. It's not the notices. It's not the types of things covered by Section 203. It's an effort to ensure larger access to language for language minorities in the county. But doesn't the website give them the ability to if they wanted to order an absentee ballot or if they wanted to look at their voter card? The Gwinnett website does not give that functionality. It's the secretary's website. So the Gwinnett office provides bilingual precinct cards to all voters. There's separate functionality on the secretary's website that generates a card online. That one is in English only, but Gwinnett has nothing to do with that website. In addition, there are for any sort of absentee ballot applications, any sort of other documents where a voter would interact with the Gwinnett office. Those are provided in English and Spanish on the Gwinnett County website. And I think that that's that's the key point here for all of this. And I think your honors have already hit on this, that what essentially the plaintiffs are looking for is a recipient focused view of Section 203. If someone who might be a language minority receives materials, they should be bilingual. The statute is very clear. It's jurisdiction focused. When the jurisdiction that is covered provides those materials, that's when things happen. Your obligation under statute is just to provide the material in in the LEP language. Yes, your honor. That's correct. And that is what Gwinnett is doing. And I think as the district court found that we there was no dispute that the materials Gwinnett provided are doing that. Now, is there and my understanding, you can correct me if I'm if I'm wrong, but my understanding is that there isn't anything in the record that somehow indicates that. And I know you're not the secretary, but I'm sure you can answer the question that the materials, if you translate them, are incorrect or provide incorrect or deficient information. That's correct, your honor. Nothing in the record reflects that the only quibble with translations was the auto translate feature that plaintiffs allege. And as we referenced in our brief that they never asked for any prayer in the relief for that. They asked for changes to the secretary's website, but there was no obligation that Gwinnett was improperly translating materials or that individuals were unable to understand the materials that Gwinnett actually provided. I'll just briefly also reference the 4E provisions. There's no provisions in 4E that provide anything beyond the duties Gwinnett is under under Section 203. And since we all agree that we're covered for purposes of Section 203, there's no issue there that an allegations about Gwinnett County. Can I ask you a practical question? Why doesn't the website just say Espanola where you click? And your honor, I've looked at that, too. And I think the answer is because it displays whatever language the website is currently displayed in. I don't understand why y'all don't change that. I mean, anyone who sees it knows that it's in English. That's not the point. You know, wouldn't it be more effective if the click was to a different language that, you know, oh, if I want to see Espanola, I can go here. That makes sense, your honor. There's about a dozen different languages that you can select beyond just English and Spanish on the Gwinnett website. A variety of Asian languages as well. And that's sort of an interesting thing, because even if you're using your phone, you can change and you can go back and forth and change. As someone in Miami, sometimes I'll have to write something in Spanish and I'll have to change to Español. And then have to translate and go back to English. But it's something you have to choose. Yes, your honor. It is also a function of the Gwinnett website as a whole, not of the elections division particularly. We're under the county's whole website. So we would ask the court to affirm the district court ruling. Thank you, your honors. Thank you. Ms. Young. Thank you. And may it please the court. I'd like to start by saying that both judges Pryor and Legault are correct in their suggestion that the appellant's attempt to construe the term covered states out of the code for section 203 should not be permitted. There's no ambiguity to which states are covered states under 203. There's a list in the appendix to the CFR. It is Florida, Texas, and California. Georgia is not a covered state. And the language of 203 is clear that it applies these bilingual language requirements only to covered states and to those that are subject to the provisions. The attempt to bootstrap Georgia in by suggesting that any time you have a political subdivision within a state would basically require that every state that has at least one political subdivision would become covered simply if they put English language content on any of their websites. The fact that a website existed in English somewhere that a voter in Gwinnett County might conceivably see it does not in and of itself, create a violation of section 203 when that is published by somebody that is not a covered state or political subdivision. After the dismissal of the admission of the appellants that they no longer have any claims with regard to mailings by the Secretary of State, that's really all we're left with here is website content. And there's nothing about either section 203 or section 40 that would suggest that there's any obligation on the part of the Secretary of State to provide bilingual translation of all of its website contents and applications. The obligations are under both sections 203 and 40 belong to Gwinnett County. 203 expressly tasks Gwinnett County with those duties and as a practical matter section 40, you know, in order to state a claim for conducting an election. Can you focus on section 40 in terms of the Secretary's obligations? Certainly, the scope of section 40 is even narrower than section 203. It does not expressly provide that any jurisdiction has to provide bilingual translations of everything it simply provides that if a covered voter, such as a Puerto Rican that was educated in a Spanish language public school, for example. needs to exercise the right to vote that they have to have the ability to do that, that the local election supervisors need to have you know sufficient materials or instructions available so that that person is not denied their right to vote, based on their inability to read or understand the English language. There's been no suggestion by the plaintiffs that that has in fact happened in Gwinnett County or anywhere else in the state of Georgia. And no suggestion that the mere fact that the Secretary publishes its website in English could somehow prohibit a covered voter from effectively exercising their right to vote as required by 4E. For similar reasons, the claims that have been raised by the appellants are also moot. Any allegations that they had with regard to the 2020 and 2021 elections are not subject, capable of repetition. And I just want to confirm this. My understanding is so Gwinnett County. So if I am an LOP voter and I wanted an absentee ballot, and I live in Gwinnett County, I asked Gwinnett County for the absentee ballot, correct? The Secretary does not send those out.  I understand that during the pandemic, there was that one time, but after the statute has now passed, there's been a clarification and the Secretary says we're not going to do that again and the statute now prohibits that anyway. So it's only Gwinnett County who would be providing the absentee ballots and Gwinnett County is now providing the absentee ballots and they're bilingual. That is correct. And typically, the Secretary of State does not mail out voter information or instructions to voters either. What's really left is the website itself and the mere existence of English language content on a website doesn't rise to the level of a 203 or 4E violation. That was because there was emergency funding where the state got that money. Correct. Those mailings were one time granted under the CARES Act of emergency funding and the legislature has now provided that such an action will not be repeated. There's a statutory amendment that specifically addresses that. We also would like to point out that with regard to standing, there's no injury that's traceable to or redressable by the Secretary in this case. Any injuries that could be alleged under Section 203 or 4E are not traceable to the Secretary. The Secretary doesn't conduct elections in the state of Georgia. 203, the coverage applies to Gwinnett so any violations would have to be traceable to or redressable by Gwinnett. And for 4E, the Secretary doesn't conduct elections and therefore there's no traceability or redressability there either. Thank you very much. Thank you, Ms. Young. Mr. Sells. Thank you, Chief Judge Pryor. I want to start with Judge Lagoa's question about the absentee ballots under Section 4E because I think this is incredibly important. Our supplemental complaint, which the district court did not allow us to file, alleges a 4E violation with respect to the Secretary of State's online absentee ballot application portal. And Senate Bill 202, which was passed just this year, actually requires the Secretary of State to put up an online absentee ballot application portal. So it's not correct to say, I think, that LEP voters in Gwinnett County, Puerto Rican voters in Gwinnett County, will have equal access to an absentee ballot because May I ask you about that? So the absentee ballots, so I understand they have to, the Secretary now has to provide this portal, but the ballot request still would be sent out by Gwinnett County. We don't have ballot requests, Your Honor, so the answer is no. So next year, let's say 22 election, an LEP voter in Gwinnett County can go to the Gwinnett County website, print out the form on paper, and mail it in. Everyone else in Gwinnett County can go to the Secretary of State's website, do it online, they don't have to print it, print out anything, and it's all automatic. That's unequal access, and Section 4E stands for nothing if it doesn't stand for equal access to the right to vote. Lymari Ruiz-Torres will not have access to the online absentee ballot portal, and her English-speaking peers will, in Gwinnett County, and that's why the 4E claim is so important in this case. Don't you have to allege that they won't be able to vote unless they're able to vote by mail? I don't think so, Your Honor, but that gets to the English-only or English-mostly question. The district court held you have to allege that everything's in English, and that hasn't been the way 4E has been interpreted, and it doesn't actually make sense, because if you had bilingual registration forms but English-only ballots, I don't think anyone would say that that's equal access, right? I mean, what the statute requires is that they be denied the right to vote because of their inability to understand English, and you complain about the absentee ballot portal on the Secretary's website. The Secretary's not covered, but I don't know where you allege that your clients would not be able to vote because of their inability to understand English. We don't think that it's an absolute denial, and the case law doesn't suggest that. I would encourage you to look at the Torres v. Sachs case that we cite in our brief, and also the Seventh Circuit's Cusper case that we cite in our briefs. It simply hasn't been interpreted as an English-only provision. We think the better rule is that Section 4E makes it unlawful to condition any important aspect of the voting process on the ability to understand English, which is what we allege here. And another way to look at it is, look, English-speaking voters in Gwinnett County have a right to vote to request an absentee ballot online, and Leymari Ruiz-Torres does not. It's that simple. Yeah, but that's voting in a particular manner. That doesn't mean she can't vote. It doesn't, but I don't think the promise of 4E is realized if we have second-class citizens and second-class ways of voting here. I also want to say just a couple of words about Section 203, because I want to make sure— Section 4E is very specific, and it says, shall be denied the right to vote. I mean, that's a very particular language, which means that you will not be allowed—you are being denied the right to vote. So if Gwinnett County sends the bilingual absentee ballot, which both your clients admitted that they received, and now Gwinnett County—and they voted in the primary and they voted in the general election, I mean, they were not denied the right to vote. So I'm having difficulty, and again, the legislature wrote this statute in the way that they did, and Georgia is not a covered state, so they don't have to provide LEP information to other counties. So the one county that is covered is Gwinnett County, and they provide that information. Well, Your Honor, I could give a history of Section 4E. We don't have the time for that, but it was adopted because of New York's literacy test that was aimed at Puerto Ricans. But once those literacy tests fell, Section 4E was applied in situations where Puerto Rican voters didn't have equal access to the voting process because of other barriers that were in their way. And, you know, the Puerto Ricans were in New York City, and it has been applied across the country, and it applies here in Georgia. But I want to make clear under Section 203 that we are not seeking a bootstrap or an expansion under our reading of the statute. Mr. Sells, your time has expired. Oh, I'm sorry. I think we went over that material earlier, and I think we have your case. We're going to move on. Thank you for your argument. Thank you, Your Honor. Thank you all.